IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

HEATHER BARRY, Friend of R.R., )
 )
    Plaintiff, )
 )
v. ) Case No. 10-4139-CV-C-REL-SSA
 )
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
 )
    Defendant. )

## **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This is a proceeding under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381, et seq. Section 1631(c)(3)of the Act, 42 U.S.C. §1383(c)(3), provides that "[t]he final determination of the Commissioner . . . shall be subject to judicial review as provided in section 205(g) [42 U.S.C. § 405(g)] to the same extent as the Commissioner's final determination under section 205."

Plaintiff argues that the administrative law judge erred by finding that plaintiff's impairments do not meet and are not the functional equivalent of the listings. I find that there is substantial evidence in the record to support the judge's decision. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### *I. BACKGROUND*

On December 18, 2006, plaintiff's mother, acting on plaintiff's behalf, protectively filed an application for child's supplemental security income (SSI) benefits based on disability under Title XVI (Tr. 90-98). The application was denied initially (Tr. 42, 44-47). On March 24, 2009, following a hearing, an administrative law judge (ALJ) found that plaintiff was not under a "disability" as defined in the Act at any time from December 18, 2006, through the date of the decision (Tr. 7-27). On April 30, 2010, the Appeals Council of the Social Security Administration denied plaintiff's

request for review (Tr. 1-4). Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008). Evidence that both supports and detracts from the Commissioner's decision should be considered, and an administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. Finch, 547 F.3d at 935 (citing Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). A court should disturb the ALJ's decision only if it falls outside the available "zone of choice" and a decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact finder in the first instance. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (citations omitted). The Eighth Circuit has further noted that a court should "defer heavily to the findings and conclusions of the SSA." Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## III. THE RECORD

The record consists of the testimony of plaintiff's mother, Heather Barry, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

2

On December 18, 2006, plaintiff's mother protectively filed an application for child's SSI benefits(Tr. 90-98). Plaintiff was born in 2004; and his mother alleged that he became disabled on May 12, 2004, due to his "mental health" (Tr. 90, 117).

In an undated disability report, plaintiff's mother reported that plaintiff was then getting medical assistance (Tr. 116). Concerning plaintiff's medical care, plaintiff's mother disclosed two sources for treatment records: Cornerstone Pediatrics in Prescott, Arizona and Rainbow Kid's Clinic in Prescott Valley, Arizona (Tr. 118). The notes reflect that plaintiff's mother reported that plaintiff was seen by Dr. Sykes in Prescott, Arizona, but she had no further information to locate the doctor (Tr. 121). Plaintiff's mother claimed that Dr. Sykes had seen plaintiff for violent behavior in August 2005, on two occasions before the family moved to Missouri, and that Dr. Sykes reportedly described plaintiff as having autistic tendencies (Tr. 121). The examiner could not find a "Dr. Sykes" in the agency's data base (Tr. 121). Since moving to Missouri, plaintiff's mother reported that she had not been able to get plaintiff to a doctor (Tr. 121).

In an undated claimant's medications form, plaintiff's medications were listed as: Prozac[1] for moods; Risperdal[2], an anti-psychotic; and Klonidine[3] (sic), a mood stabilizer (Tr. 157). The prescribing physician is shown as Dr. Lorenzo (Tr. 157).

On December 20, 2006, plaintiff's mother completed an application summary for supplemental security income (Tr. 90). In the application, plaintiff's date of birth was listed, and his disability date was alleged to be his date of birth (Tr. 90). The application also disclosed the public

---

[1]Prozac is used to treat depression.

[2]Risperdal is used to treat symptoms of schizophrenia.

[3]Clonidine is used for a variety of conditions including ADHD.

3

assistance being provided to members of the household: SSI for the mother, AFDC for the sister, SSI for the brother, SSI for the grandmother, and $234.00 AFDC benefits and food stamps for the plaintiff (Tr. 91-92).

On January 29, 2007, E. Markey, a disability examiner, wrote an explanation of determination concerning plaintiff, then age 2 (Tr. 43). The examiner recounted the allegations of plaintiff's mother, including plaintiff's head banging (Tr. 43). The examiner reported that plaintiff was seen by two physicians who reported "[not] much going on psych-wise" and "no physical impairment" (Tr. 43). Based on these opinions, the examiner found plaintiff had no mental or physical impairments for plaintiff that resulted in marked or severe limitations (Tr. 43).

### B. SUMMARY OF TESTIMONY

On January 7, 2009, the ALJ conducted an evidentiary hearing during which plaintiff's mother, Heather Barry, testified (Tr. 28-41).

Ms. Barry testified that she was then 33 years of age (Tr. 32). The Barry household includes Ms. Barry, the plaintiff, Gia Rodriquez (plaintiff's sister), Ava Chilton (plaintiff's sister), Anthony Catollono (plaintiff's brother, age 17), and Theresa Heart (Ms. Barry's mother) (Tr. 33).

The oldest child, Anthony, collects Social Security benefits because he suffers from bi-polar disorder, ADHD, mood swings, and post-traumatic stress disorder (Tr. 33). Ms. Barry also collects Social Security benefits as a result of seizures, brain damage, and a heart condition (Tr. 33).

According to Ms. Barry, plaintiff cannot hold still and cannot maintain eye contact (Tr. 34). Ms. Barry also reported that plaintiff engages in head banging (Tr. 35-36). Ms. Barry reported that plaintiff does not experience pain the same as other children (Tr. 36). Ms. Barry indicated that plaintiff has speech problems, which make it difficult for him to be understood (Tr. 36). Ms. Barry

4

said that plaintiff does not engage in play but rather in destruction (Tr. 36). Ms. Barry reported that plaintiff engages in animal abuse (Tr. 37).

As a result of plaintiff's aggressive behavior, Ms. Barry said that she must keep a careful watch on him when he is around his younger sister (Tr. 37).

Ms. Barry reported that plaintiff presents behavioral problems when he is riding in the car, e.g., unbelts himself, tries to open the door, and throws things from the open window (Tr. 37). Plaintiff also throws temper tantrums every day, all day long, on and off (Tr. 38). These tantrums number 15 to 20 every day (Tr. 38). Plaintiff screams, throws things, growls, drops to the floor, and head-butts his mother (Tr. 38).

Plaintiff attends pre-school intervention for two hours four times a week (Tr. 34-35). The program was recommended for plaintiff by the Thompson Center's Dr. Strough who is an assistant professor in Division of Developmental Pediatrics, Department of Child Health (Tr. 35). Plaintiff has good days and bad days at school (Tr. 39).

Plaintiff takes medications including Prozac and Quanadine (Tr. 39).

### C. SUMMARY OF MEDICAL RECORDS

On June 30, 2005, plaintiff, then age one year and one month, was seen by Claretta Munger, a nurse practitioner (Tr. 169). Plaintiff had been banging his head on crib railings and the floor (Tr. 169). Plaintiff was on no medications except Tylenol as needed (Tr. 169). The notes reflect that plaintiff's parents separated about 6 weeks earlier and that the father was no longer in the picture (Tr. 169).

On August 4, 2005, plaintiff saw Claretta Munger, a nurse practitioner (Tr. 167-68). There was "[n]o bruising" and "no further note re[garding] head banging" (Tr. 167).

5

On March 1, 2007, plaintiff, then two years and nine months, was examined by Nitin Patel, M.D., Associate Professor, Division of Pediatric Neurology, at the University of Missouri Children's Hospital (Tr. 201-203). The plaintiff's mother expressed concerns that the plaintiff may have Asberger Syndrome[4] (Tr. 201). The mother reported that plaintiff was obsessive about certain foods and would talk about them for hours (Tr. 201). The mother reported that plaintiff had throwing fits and often screamed. The mother reported that plaintiff would rearrange stuff in the home and if it was thereafter arranged differently he would get very upset (Tr. 201). The mother noted that plaintiff used to bang his head when he was an infant (Tr. 201). The mother indicated that plaintiff had a "low[5] pain tolerance" and would sleep next to a heater and develop burns without noticing the pain. According to the mother, plaintiff could not sit still for over 15 minutes and could not wait his turn (Tr. 201).

The physical examination of plaintiff revealed no abnormalities (Tr. 202). During the mental status examination, the doctor observed that plaintiff was alert and awake and in no acute distress; plaintiff was not irritable; and plaintiff was oriented to person (Tr. 202). The doctor noted that the plaintiff did demonstrate a short attention span and hyperactivity, jumping from chair to table in the room, running around the room, and throwing a fit when not getting his way (Tr. 202). Plaintiff's fund of knowledge and social interaction was appropriate for his age; however he did scream, run about, and throw things in the room during the examination. Plaintiff repeatedly turned the faucet on and off, and flipped the light switch on and off throughout the examination (Tr. 202). Dr. Patel's

---

[4] Asberger Syndrome is a high functioning form of autism characterized by problems with social behavior.

[5] Although the medical record says "low" pain tolerance, clearly the meaning was a "high" pain tolerance.

impression was that plaintiff was a two-year-nine-month-old male with staring episodes and behavioral problems (Tr. 203). Per his mother's description, this behavior may be related to ADHD, possibly Asperger's syndrome, or some other diagnostic possibility (Tr. 203). Plaintiff was started on Risperdal[6] for one week (Tr. 203). Plaintiff's mother was instructed to return him for a follow up visit in four months (Tr. 203).

On May 1, 2007, magnetic resonance imaging (MRI) of plaintiff's brain revealed moderate adenoidal hypertrophy[7], but the scan was otherwise normal (Tr. 199-200).

On May 3, 2007, an electroencephalogram (EEG) was normal (Tr. 197-98).

On June 30, 2008, more than one year after his initial visit, plaintiff returned to Dr. Patel for a follow-up visit. Plaintiff was noted to be a four-year-and-one-month-old child with a diagnosis of ADHD and abnormal behavior. According to the mother, plaintiff's behavior was only good for one day a week (Tr. 204-05). The rest of the week plaintiff's behavior was fair (Tr. 204). Plaintiff would lose his control and throw things, fight with his mother, and scratch his sister (Tr. 204). Plaintiff was noted to be on Clonidine[8] and Risperdal twice a day (Tr. 204). Plaintiff was noted to be slightly speech delayed but catching up (Tr. 204). Plaintiff was noted to have an EEG and MRI done earlier, both of which were normal (Tr. 204). Dr. Patel increased plaintiff's medications and directed that the child return in four months (Tr. 204).

On July 8, 2008, plaintiff was seen by Tracy A. Stroud, D.O., in the Developmental Behavior Clinic (Tr. 206-10). The mother indicated that plaintiff's mornings would go well but that his

---

[6]Risperdal is an anti-psychotic drug used to treat a number of mental illnesses including schizophrenia, bi-polar disorder, and symptoms of autism.

[7]Adenoidal hypertrophy is an abnormal growth of the adenoid tonsil.

[8]Clonidine is used to treat ADHD in children.

7

afternoons from about noon onward were "not real good" (Tr. 206). The mother reported that plaintiff did not make eye contact with other kids and did not interact well with others (Tr. 207). It was noted that plaintiff was delayed in his language (Tr. 207). The mother reported obsessive compulsive type of behaviors (Tr. 207). The mother reported that plaintiff was having fairly significant behavioral outbursts (Tr. 207). Plaintiff's mother brought in a video showing plaintiff yelling, screaming and hollering, having poor tolerance for frustration, and not wanting to wait (Tr. 207). Dr. Stroud's impression was that plaintiff was a four-year-one-month old child with disordered speech. Plaintiff's articulation was difficult to understand. Plaintiff also had behavioral concerns. Plaintiff was given a working diagnosis of early attention-deficit/hyperactivity disorder (Tr. 209). The doctor noted that plaintiff did not have sufficient symptoms for an autism spectrum disorder diagnosis (Tr. 209). The doctor observed that plaintiff made great eye contact, plaintiff was fun to play with, and it was easy to establish a rapport with him (Tr. 209). The doctor said that plaintiff was curious and able to be redirected and distracted (Tr. 209). Plaintiff was noted to have poor tolerance to frustration and impulsive behaviors (Tr. 209). Dr. Stroud wanted to see how plaintiff would do in a structured preschool program (Tr. 209). The doctor increased plaintiff's Risperdal to one mg twice a day and asked to see the child in a month (Tr. 209).

On August 12, 2008, plaintiff returned to see Dr. Stroud who noted that the plaintiff was a four-year-three-month old child with significant behavioral concerns (Tr. 211-13). The doctor stated that plaintiff was in need of an early intervention program because she suspected early onset of ADHD (Tr. 212). Plaintiff's mother stated that she had not had time to call the early childhood special education program, but instead had applied for SSI benefits for plaintiff (Tr. 211). Plaintiff's mother mentioned that she went through a lot of behavioral intervention programs with her 17-year-

old son but did not find them to be helpful, and that school was not very receptive to her older son so she was not eager to try to revisit these strategies (Tr. 212-13). The doctor recommended a series of books on discipline strategy and provided plaintiff's mother with other materials on handling a child with anger issues (Tr. 213). The doctor encouraged plaintiff's mother to contact the early childhood program and have plaintiff screened (Tr. 213).

On August 25, 2008, plaintiff, then three years and four months, was seen by Dr. Lorenzo for a "psychiatric evaluation" (Tr. 236). Plaintiff was noted to have a history of ADHD (Tr. 236).

On September 7, 2008, plaintiff was seen in the emergency room at the Phelps County Regional Medical Center, complaining of a medication reaction (Tr. 216). During the stay in the emergency room, plaintiff was noted to be throwing a tantrum and could not be calmed. A half hour later, it was noted that the Valium had not helped and that plaintiff remained upset (Tr. 227).

On September 8, 2008, plaintiff went to see Dr. Lorenzo who indicated that plaintiff was alert, oriented and calm; his affect was constricted; speech was pressured; thought content contained violent thoughts; and insight was poor (Tr. 237, 241). Dr. Lorenzo diagnosed ADHD, R/O[9] autism (Tr. 237).

On October 20, 2008, Dr. Lorenzo completed a child disability evaluation form by checking off boxes on the form without any explanation (Tr. 229-34). Dr. Lorenzo indicated that the plaintiff "functionally equals the listings" (Tr. 229). Dr. Lorenzo found plaintiff had a less-than-marked level of limitation in regard to acquiring and using information, moving about and manipulating objects, caring for himself, and health and physical well being. Dr. Lorenzo found a marked level of

---

[9]"Rule out" means that, for whatever reason, a doctor may suspect a condition but that further testing needs to be done.

limitation in attending and completing tasks and interacting and relating with others (Tr. 230-31).

On November 25, 2008, Dr. Lorenzo noted that plaintiff's mother had called and terminated his services (Tr. 242). The doctor also observed that plaintiff's mother was difficult to deal with regarding her children (Tr. 242). Dr. Lorenzo closed plaintiff's case (Tr. 242).

### *D. THE ALJ'S DECISION AND THE APPEALS COUNCIL'S REVIEW*

On March 24, 2009, the ALJ entered his decision, in which he found:

1. The claimant was . . . an older infant on December 18, 2006, the date the application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3. The claimant has the following severe impairment: attention-deficit hyperactivity disorder (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since December 19, 2006, the date the application was filed (20 CFR 416.924(a)).

(Tr. 10-27.)

On April 30, 2010, the Appeals Counsel entered a Notice of Appeals Council Action (Tr. 1-4). In the letter, the appeals officer observed that the following information, submitted to the Appeals Council, addresses events and conditions that occurred after March 24, 2009, the date of the ALJ's decision, and therefore these submissions would not be considered:

1. June 13, 2009, letter from Christina Woods, M. A., LPD, with treatment notes dated March 31, 2009, through May 31, 2009;

2. July 9, 2009, child disability report submitted by Christina Woods, M.A., LPD;

3. July 9, 2009, through July 17, 2009, Royal Oak Hospital medical records; and

4. M. Kantar Choudhary, M.D., consultive assessment, and treatment notes from Brenda Linkeman, MSSW, LCSW, dated June 25, 2009 through August 27, 2009.

(Tr. 2.)

## *IV. IS THERE SUBSTANTIAL EVIDENCE THAT PLAINTIFF'S IMPAIRMENT NEITHER MEETS NOR IS EQUIVALENT TO A LISTING?*

Plaintiff argues that the ALJ erred by finding that his impairment results in less than a "marked" limitation in the domain of attending and completing tasks. A finding that the limitation is marked would result in a finding that plaintiff's impairment meets or equals a listed impairment because the ALJ found that plaintiff had a marked limitation in the domain of interacting and relating with others. A finding that a child suffers from marked limitations in two domains establishes the functional equivalent of a listed impairment.

A three-step sequential evaluation process is used to determine disability for children. 20 C.F.R. § 416.924(a) (2010). The three-step process requires a child to show: (1) that the child was not performing substantial gainful activity; (2) that the child has a "severe" impairment or combination of impairments; and (3) that the child's impairment or combination of impairments meet, medically equal, or functionally equal the severity of an impairment found in the listings. 20 C.F.R. § 416.924.

To establish functional equivalence, a child must have a medically determinable impairment or combination of impairments that result in "marked" limitations in two domains, or an "extreme" limitation in at least one domain. The following six domains are considered:

    (1)  acquiring and using information;

    (2)  attending and completing tasks;

    (3)  interacting and relating with others;

    (4)  moving about and manipulating objects;

    (5)  caring for himself or herself; and

    (6)  health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi) (2009).

  A child will be considered to have a "marked" limitation in a domain when the child's impairment seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" means a limitation that is "more than moderate" but "less than extreme." Id.

  A child's limitation is "extreme" in a domain when the child's impairment "very seriously" interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation is given to the worst limitations, but it does not necessarily mean a total lack or loss of ability to function. Id.

  The ALJ found that plaintiff has the severe impairment of ADHD, but that the impairment does not meet and is not the medical equivalent of the severity standards for an impairment established by 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 13). The ALJ found that plaintiff has a "marked" limitation in the domain of interacting and relating with others but has no other "marked" limitations, including in the domain of attending and completing tasks (Tr. 20-27). Consequently, the ALJ concluded that plaintiff is not disabled (Tr. 20-27).

  On the domain of attending and completing tasks, the ALJ wrote:

b. Attending and Completing Tasks

This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities; including the pace at which he performs activities and the ease of changing activities (20 CFR 416.926a(h)).

The regulations provide that an older infant/toddler without an impairment should he able to attend to things that interest him and have adequate attention to complete some tasks. As a toddler, he should demonstrate sustained attention, such as when looking at picture books, listening to stories, or building with blocks, and when helping to put on his clothes (20 CFR 4l6.926a(h)(2)(ii)).

The regulations provide that a preschooler without an impairment should be able to pay attention when he is spoken to directly, sustain attention to his play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should also be able to focus long enough to do many more things independently, such as gathering clothes and dressing, feeding, or putting away toys. The child should usually be able to wait his turn and to change his activity when a caregiver or teacher says it is time to do something else (20 CFR 416.926a(h)(2)(iii)).

Social Security regulation 20 CFR 416.926a(h)(3) sets forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; or (v) requires extra supervision to remain engaged in an activity.

The claimant has less than marked limitation in attending and completing tasks. The evidence shows the claimant is impulsive and needs to be redirected. Dr. Stroud thought the claimant needed behavioral modification to accompany his medication. (5F/9). However, Dr. Stroud did not make any medication changes.

The record has failed to show any consistent treatment for attention-deficit hyperactivity disorder such as the recommended combination of medication and therapy as well as behavior modification. Indeed the record clearly shows the claimant's mother is more concerned with obtaining disability benefits for as many

13

children as possible than to comply with medical treatment directives. Despite Dr. Stroud agreeing to perform medication management and directing the claimant to a number of agencies such as the Wyman School and others, the claimant began seeing Dr. Lorenzo for psychiatric care soon after his last visit to Dr. Stroud. There is no reliable evidence that the claimant could not meet the potential described by Dr. Stroud if he was consistently kept on the same medication and/or if his mother took advantage of the counseling services and behavior modifications recommended. Even by the second visit with Dr. Stroud, the claimant's mother had still not taken the steps necessary to have the claimant screened by the early childhood program so he could access the necessary services to obtain counseling and the like (5F/10). The pattern of the claimant's mother results in the inference that these medical appointments are for legal purposes (i.e., to generate evidence in a disability claim) as opposed to medical purposes (to assist the claimant medically); as the mother fails to follow through. If the problems are as severe as she claims, she would certainly follow through with medical directives designed to reduce or alleviate these purportedly disabling symptoms and problems.

(Tr. 21-22.)

Consistent with 20 C.F.R. § 416.1470(b)[10], I will not consider the record to the extent it deals with events that occurred after March 24, 2009, the date of the ALJ's decision.

In evaluating the record, it is apparent that much of the information about many of plaintiff's alleged symptoms and diagnoses originates with his mother, who, as the ALJ pointed out, has a significant financial interest in portraying a dismal picture of the plaintiff's medical condition and history; and, equally as important, has almost no identifiable basis in the medical records. Consider, for example, the following:

> In an undated disability report, plaintiff's mother disclosed two sources of medical information for the child in Prescott, Arizona, but could not provide any contact information for either source; and the treating physician (a "Dr. Sykes" who allegedly reported that the child has autistic tendencies) could not be located in the agency's data base (Tr. 121).

---

[10] 20 C.F.R. § 416.1470(b) provides in part that "[i]n reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."

In a December 20, 2006, application for SSI, plaintiff's mother revealed that virtually the entire family was at the time on some form of public assistance: SSI for the mother; AFDC for the sister, SSI for the older brother; SSI for the grandmother who was living in the home; and AFDC and food stamps for this child (Tr. 91-92).

During a March 1, 2007, examination by Nitin Patel, M.D., at the University of Missouri Children's Hospital, plaintiff's mother reported plaintiff throwing fits, having screaming episodes, and inflicting injuries on himself; while the doctor observed a child in no acute distress, not irritable, oriented to person, with a short attention span and hyperactivity, and with an appropriate fund of knowledge and social interaction (Tr. 202). The doctor's impression was a child engaging in staring episodes and displaying behavioral problems (Tr. 203). The doctor asked to see plaintiff in four months (Tr. 203).

On June 30, 2008, Dr. Patel saw plaintiff on a return visit (over a year after plaintiff's initial visit) (Tr. 204). Although plaintiff's mother continued to complain about plaintiff's behavior, the doctor noted that the child was slightly speech delayed but catching up (Tr. 204). The doctor also observed that both an EEG and MRI performed on plaintiff came back normal (Tr. 204).

On July 8, 2008, plaintiff saw Tracy A. Stroud, D.O., in the Developmental Behavior Clinic (Tr. 206-10). Plaintiff's mother again reported bad behavior, failure to make eye contact, and an inability to interact with other children; while the doctor observed that plaintiff made great eye contact, was fun to play with, was easy to establish a rapport with, and was able to be redirected and distracted (Tr. 209). The doctor recommended a structured preschool program, and she increased plaintiff's medication (Tr. 209).

On August 12, 2008, plaintiff returned to see Dr. Stroud (Tr. 211-13). Plaintiff's mother had failed to follow up on the early childhood special education program recommended on July 8, 2008, and expressed little interest in pursuing that avenue for the child because of a bad experience with her other son (Tr. 212-13). Instead, plaintiff mother mentioned that she had applied for SSI benefits for plaintiff (Tr. 211). Dr. Stroud recommended a series of books on discipline for plaintiff's mother and provided her with other materials on dealing with a child with anger control issues (Tr. 213). On attending and completing tasks, the doctor observed that plaintiff was able to peddle a bicycle some, and stacked blocks, and was able to be directed with praise (Tr. 212). Additionally, on the financial motivation, the note states that the family was living off SSI benefits for plaintiff's mother and grandmother, and that plaintiff's sister had also applied for SSI benefits, which were denied (Tr. 211). Finally, there is no record that plaintiff's mother followed through on the doctor's recommendations or ever returned to see Dr. Stroud.

On September 8, 2008, plaintiff went to see Dr. Lorenzo (Tr. 237, 241). Dr. Lorenzo described plaintiff as alert, oriented, affect was constricted, speech was pressured, thought content contained violent thoughts and insight was poor (Tr. 237, 241). Dr. Lorenzo suspected autism but only diagnosed ADHD (Tr. 237).

On November 25, 2008, Dr. Lorenzo noted that plaintiff's mother terminated services with him and was difficult to deal with concerning her children (Tr. 242).

As the ALJ noted, although plaintiff was impulsive and needed to be redirected, Dr. Stroud indicated that plaintiff's condition could be improved with a combination of medication, counseling, and behavioral intervention (Tr. 22, 209, 212). In fact, plaintiff's mother informed Dr. Stroud that medication was effective in controlling plaintiff's behavior in the mornings (Tr. 17, 209). Impairments that are controllable or amenable to treatment do not support a finding of disability. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). As the ALJ pointed out, the evidence from the relevant time period fails to demonstrate consistent treatment for ADHD despite the apparent efficacy of medication and Dr. Stroud's recommendation that plaintiff's mother utilize counseling and behavioral intervention for plaintiff (Tr. 22).

- On March 1, 2007, Dr. Patel instructed plaintiff's mother to bring plaintiff back for a follow-up appointment in four months, but she did not return plaintiff to Dr. Patel until June 30, 2008, over one year later.

- On July 8, 2008, Dr. Stroud referred plaintiff's mother to the Wyman Elementary Early Childhood Special Education Program; but when plaintiff returned to Dr. Stroud on August 12, 2008, plaintiff's mother had not yet contacted the Wyman Elementary Early Childhood Special Education Program.

- On August 12, 2008, Dr. Stroud informed plaintiff's mother that behavioral interventions would be effective in improving plaintiff's behavior, he recommended a discipline strategy book, and he told plaintiff's mother to bring plaintiff back in two months. There is no indication in the record that plaintiff returned to Dr. Stroud or that plaintiff's mother followed through with the recommended behavioral interventions.

A claimant's failure to seek medical assistance for his alleged impairments "contradicts [his] subjective complaints of disabling conditions and supports the ALJ's decision to deny

16

benefits." Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) . Furthermore, failure to follow a recommended course of treatment diminishes a claimant's subjective complaints of disabling symptoms. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). Plaintiff's mother's failure to follow the recommendations of treatment providers combined with her admittedly living off of the disability and other government benefits that had been awarded to family members and her attempt to secure disability benefits for not only plaintiff but for another siblings in the family strongly suggests that her claim that plaintiff suffers disabling symptoms is not credible but is rather an attempt to secure a greater disability income for her family. The ALJ may discredit subjective complaints of disabling symptoms based on a strong element of secondary gain -- which clearly exists in this case. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir.1996) .

Plaintiff relies on the October 20, 2008, Childhood Disability Evaluation completed by Dr. Lorenzo in support of his argument that he suffers from a marked limitation in the domain of attending and completing tasks. The ALJ, however, fully considered Dr. Lorenzo's assessment and properly determined that it was entitled to little weight because it was unsupported by the medical evidence of record, including Dr. Lorenzo's own treatment notes, and appeared to be based primarily on plaintiff's mother's subjective reports of plaintiff's limitations. "If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007). As the ALJ noted, Dr. Lorenzo's assessment consisted of a checkbox form on which Dr. Lorenzo checked a box indicating that plaintiff had a marked limitation in the domain of attending and completing tasks. Dr. Lorenzo did not include any

17

explanation as to why he believed plaintiff had a marked limitation in the domain of attending and completing tasks, nor did he cite any medical evidence to support his conclusion. His records indicate that plaintiff was alert, oriented and calm and that he was able to pedal a tricycle and stack blocks. Dr. Lorenzo saw plaintiff for an evaluation on August 25, 2008, and for an office visit on September 8, 2008. There was no other evaluation or treatment before Dr. Lorenzo completed the checklist opinion for plaintiff's disability application. When a physician's opinion is conclusory, consists of checklist forms, cites no medical evidence, and provides little or no elaboration, the ALJ may properly discount that opinion. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). In this case, the ALJ did precisely that.

### V. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled during the relevant time period. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 26, 2011